# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 07-2505, 07-2506, 07-2507 and 07-3313

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DOUGLAS FARMER, JAMES ELLIS,
JOSIAH COMPTON, and GERALD
HOWLIET,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Southern District of Illinois.
No. 04 CR 30139—**G. Patrick Murphy**, *Judge.*

_____

ARGUED JUNE 6, 2008—DECIDED SEPTEMBER 9, 2008

_____

Before BAUER, RIPPLE and MANION, *Circuit Judges*.

BAUER, *Circuit Judge*. This is a consolidated appeal from the convictions of four out of fourteen defendants for various offenses stemming from a drug distribution ring in the East St. Louis, Illinois area.

The government began investigating Defendants-Appellants Douglas Farmer, James Ellis, Josiah Compton, and

Gerald Howliet in 2003 after learning of their involvement in the distribution of crack, powder cocaine, and marijuana. The investigation included the review of police reports, telephone records, and pen registers, as well as law enforcement surveillance, wire communications interception, and intelligence provided by confidential informants. Through the execution of search warrants, agents eventually seized more than 11.6 kilograms of powder cocaine, 536 grams of crack cocaine, 6.1 grams of heroin, 14.8 kilograms of marijuana, $120,640.00 in U.S. currency, and numerous firearms. A jury convicted Defendants-Appellants on various drug-related charges, which they now appeal. We address each Defendant-Appellant's respective arguments in turn.

### I. Douglas Farmer

On November 18, 2004, Farmer was indicted for conspiracy to distribute and possess with the intent to distribute cocaine, cocaine base, and marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846, and 18 U.S.C. § 2; thirteen others were named in the indictment on conspiracy and/or various other drug-related offenses. The last defendant was arraigned on January 13, 2005.

On December 1, 2004, one of the co-defendants filed a motion to suppress. While that was pending, another motion was filed, then another, then another; in fact, a series of overlapping motions continued pending throughout the duration of the case.

On February 22, 2007, Farmer filed a motion to dismiss the indictment, alleging a violation of the Speedy Trial Act,

18 U.S.C. § 3161 et seq. Farmer acknowledged that "excludable days of delay ha[d] occurred," but argued that "the delay that has been experienced herein exceeds any permissible exception visualized by the Speedy Trial Act." The district court denied Farmer's motion, finding that seventy days of non-excludable time had not passed between the last co-defendant's arraignment and Farmer's trial because of the filing of several motions by Farmer and his co-defendants. Farmer re-asserts the same argument on appeal, and like the district court, we reject it.

We review the district court's denial of Farmer's Speedy Trial motion *de novo*. *See United States v. Parker*, 508 F.3d 434, 438 (7th Cir. 2007) (citing *United States v. Baskin-Bey*, 45 F.3d 200, 203 (7th Cir. 1995)). The Speedy Trial Act provides that no more than seventy days may elapse between a defendant's initial appearance in court and the commencement of trial. 18 U.S.C. § 3161(c)(1); *Parker*, 508 F.3d at 438. When more than one defendant is charged in an indictment, the Speedy Trial clock begins to run on the date of the last co-defendant's initial appearance, which is usually arraignment. *Parker*, 508 F.3d at 439; *United States v. Garrett*, 45 F.3d 1135, 1138 (7th Cir. 1995). In calculating the Speedy Trial clock, the Act specifically excludes "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F). Furthermore, the Act excludes any reasonable time lapse occurring "when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(7); *see Henderson v.*

*United States*, 476 U.S. 321, 323 n.2 (1986) (noting that in multi-defendant cases, the seventy-day clock does not begin until the last co-defendant has been arraigned).

The excludable delay of Farmer's co-defendants is ascribed to him, since Farmer was not severed, nor did he seek severance, from those co-defendants for trial. *See United States v. Baker*, 40 F.3d 154, 159 (7th Cir. 1994). As Farmer acknowledges, overlapping motions filed by himself and his co-defendants remained before the district court throughout the time between his last co-defendant's arraignment on January 13, 2005, and the start of his trial on March 6, 2007. Farmer properly concedes that seventy days of non-excludable time did not lapse. So despite over two years passing between Farmer's indictment and the commencement of his trial, no Speedy Trial Act violation occurred. (In fact, although no mention was made of it in this appeal, on February 21, 2005, Farmer filed a Waiver of Speedy Trial.) We disagree with Farmer that such a delay "makes a mockery of [the Act's] statutory protection"; to the contrary, we find the delay necessary to ensure that the defendants's pre-trial motions were adequately considered as to minimize the effect of any infringement on their rights resulting from an improper indictment, illegally seized evidence, or any other impropriety.[1] Accordingly, we affirm Farmer's

---

[1] The pre-trial motions filed by Farmer alone that contributed to the delay included motions for reconsideration of bond, to continue, to change counsel, to suppress evidence, and to disqualify the first assigned district court judge. Had the

(continued...)

conviction.

## II.  James Ellis

Ellis was convicted of conspiracy to distribute and to possess with the intent to distribute cocaine, cocaine base, and marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846, and 18 U.S.C. § 2. At trial, the government played recorded telephone calls obtained through court-authorized wire taps. The government introduced these tapes through Drug Enforcement Agency (DEA) Special Agent Michael Rehg. Agent Rehg testified as a fact witness regarding the investigation's progress and events, and as an expert witness to assist the jury in understanding the coded drug language contained in the recorded conversations.

Agent Rehg testified that he had been a DEA agent for eight years, and was a Deputy U.S. Marshal for nine years before that (three years of which he was assigned to the DEA). He further testified that he was the lead case agent in this case and that he had overseen the process of obtaining the court-authorized wire taps. Agent Rehg also stated that he had participated in hundreds of drug cases, he had listened to thousands of calls in this case, and his experience gave him knowledge of the meanings of certain coded drug language.

---

[1]  (...continued)

court not thoroughly addressed these motions, Farmer would likely have a substantively different (and possibly more successful) argument on appeal.

Ellis repeatedly objected to Agent Rehg's testimony, claiming that Agent Rehg was not a qualified expert and that he was unfairly prejudiced by the district court's decision to allow Agent Rehg to testify both as a fact and expert witness. The district court allowed Agent Rehg to testify in both capacities, but gave the jury cautionary instructions regarding expert testimony.

The jury found Ellis guilty of the conspiracy charged, and the United States Probation Department prepared a Pre-Sentence Report (PSR). The PSR determined that Ellis had a total offense level of thirty-eight and a criminal history category of IV, resulting in an advisory Guidelines range of 324 to 405 months' imprisonment. This calculation included a two-level offense increase based on Ellis's possession of a firearm during the commission of the offense, pursuant to U.S.S.G. § 2D1.1(b)(1). The evidence of Ellis's possession of a firearm came from the proffer of a co-conspirator, Elvin Pawnell, who stated that he had been with Ellis and Farmer on fifteen to twenty occasions in 2005 when they were providing him with cocaine. Pawnell said that Ellis carried a .45-caliber handgun during these meetings; once, Ellis showed him the gun, and on other occasions, Pawnell saw the gun in Ellis's waistband.

Ellis filed written objections to the two-level increase pursuant to U.S.S.G. § 2D1.1(b)(1), arguing that his possession of a firearm had not been proven beyond a reasonable doubt, in violation of *Blakely v. Washington*, 542 U.S. 296 (2004). The district court rejected Ellis's argument and applied the two-level enhancement. The district court

subsequently sentenced Ellis to 288 months' imprisonment, which was below his advisory Guidelines range.

On appeal, Ellis contends that the district court erred in allowing Agent Rehg to testify as both a fact and expert witness. Specifically, Ellis claims that the district court failed to properly apply Federal Rule of Evidence 702 because it did not conduct a hearing to consider Agent Rehg's qualifications. Ellis further argues that allowing Agent Rehg to testify in both capacities unfairly prejudiced him. In addition, Ellis argues that the district court improperly applied the two-level enhancement.

We review the district court's decision to admit expert testimony for an abuse of discretion. *United States v. Goodwin*, 496 F.3d 636, 641 (7th Cir. 2007) (citing *United States v. Ceballos*, 302 F.3d 679, 686 (7th Cir. 2002)). Although Ellis appeals under Rule 702, neither Ellis nor the government specifically requested that the district court evaluate Agent Rehg's qualifications as an expert under Rule 702. *See United States v. Moore*, 521 F.3d 681, 685 (7th Cir. 2008) (noting that when neither party specifically asks the district court to engage in the analysis under Rule 702, the district court is not required to do so and does not err in admitting the testimony). Thus, the district court did not err by not inquiring further into Agent Rehg's qualifications.

Regardless, Agent Rehg was undoubtedly qualified. We have held that narcotics code words are an appropriate subject for expert testimony, and that law enforcement officers who have training and experience in drug-related transactions and crimes are qualified to testify as an

expert concerning the practices of people engaged in that type of conduct. *Goodwin*, 496 F.3d at 641 n.2; *United States v. Hughes*, 970 F.2d 227, 236 (7th Cir. 1992); *see also United States v. Mansoori*, 304 F.3d 635, 654 (7th Cir. 2002). Agent Rehg's experience included eight years as a DEA agent and nine years as a Deputy U.S. Marshal. He further testified that he had participated in hundreds of drug-related cases prior to being the lead case agent in this case, that he had listened to thousands of calls involved in this case, and that the use of the narcotics code language was consistent with his understanding of the terms' meanings. Accordingly, the district court did not abuse its discretion in allowing Agent Rehg to testify as an expert on narcotics code words.

So we turn to Ellis's argument that the district court erred in allowing Agent Rehg to testify in dual capacities. Testimony in the dual roles of both a fact witness and an expert witness can be confusing to a jury, but it is permissible provided that the district court takes precautions to minimize potential prejudice. *Goodwin*, 496 F.3d at 641. "The potential for prejudice in this circumstance can be addressed by means of appropriate cautionary instructions and by examination of the witness that is structured in such a way as to make clear when the witness is testifying to facts and when he is offering his opinion as an expert." *Goodwin*, 496 F.3d at 641-42 (quoting *Mansoori*, 304 F.3d at 654).

At trial, the government played several recorded phone conversations for the jury. After some of the calls, the prosecutor asked Agent Rehg to give his opinion about the

meaning of various terms used in the calls. Agent Rehg also testified about facts he had obtained through the investigation that were related to the subjects discussed in the recorded calls. While this framework did little to separate out Agent Rehg's fact testimony from his expert testimony, the district court did take other precautions to minimize any potential prejudice. The district court required the government to establish the proper foundation for Agent Rehg's knowledge of the coded drug language prior to him testifying to those meanings. The government also prefaced Agent Rehg's expert testimony by asking him the coded language's meaning "based on [his] expertise."[2] Furthermore, the district court gave the appropriate cautionary instruction regarding expert testimony, instructing the jury that it could judge that testimony the same way it judges fact witnesses' testimony, and could "[g]ive the testimony whatever weight you think it deserves. . . ." The district court also allowed Ellis's attorney to extensively cross-examine Agent Rehg about the coded drug terms used in the calls, his familiarity with other drug terms, and the factual aspects of his direct testimony. Ellis's attorney critically questioned Agent Rehg about his expert opinion on the coded language, noting that according to him, "shoes," "block," and "chicken" were just a few of many commonly used words

---

[2] We note, however, that the government did not preface each question that elicited Agent Rehg's expert opinion in this way. Had they done so, the framework of Agent Rehg's examination would have undoubtedly made clear to the jury the capacity of his testimony.

that he claimed meant cocaine. This thorough cross-examination highlighted the parts of Agent Rehg's testimony that were garnered from his expert opinion, which further clarified the testimonial capacities for the jury. In light of these safeguards, any risk that the jury could have confused Agent Rehg's direct observations with his expert knowledge of the code words was adequately alleviated. *See United States v. Parra*, 402 F.3d 752, 759-60 (7th Cir. 2005).

Ellis also argues that the two-level enhancement was improper because: (1) the statements by Pawnell lacked sufficient indicia of reliability and should not have been admitted; and (2) the government failed to show by a preponderance of the evidence that Ellis possessed a firearm during the conspiracy. The government asserts that Ellis has waived these arguments, and we agree.

Waiver is the intentional relinquishment of a known right, while forfeiture is the failure to timely assert a right. *United States v. Olano*, 507 U.S. 725, 733 (1993); *United States v. Jaimes-Jaimes*, 406 F.3d 845, 847 (7th Cir. 2005). Forfeiture warrants review for plain error only, but waiver precludes any appellate review. *Jaimes-Jaimes*, 406 F.3d at 847. The paramount feature of waiver is a knowing and intentional decision not to assert the right. *Jaimes-Jaimes*, 406 F.3d at 848. For strategic reasons, a criminal defendant may elect to pursue one argument while foregoing another. *Id.* In that situation, the defendant waives the arguments he decided not to present. *Id.* (citing *United States v. Cooper*, 243 F.3d 411, 416 (7th Cir. 2001)).

At the district court, Ellis filed a five-page written objection to the PSR, which included an objection to the enhancement for possessing a firearm. Ellis chose to limit his argument to whether the enhancement violated *Blakely v. Washington*, because the possession was not proven at trial beyond a reasonable doubt. He never challenged the reliability of Pawnell's proffer before now, nor did Ellis ever elect to argue, until now, that the government failed to establish his possession of a firearm during the conspiracy by a preponderance of the evidence standard. To the contrary, Ellis implicitly asserted that the preponderance of the evidence standard deprived him of his right to a fair trial. *See generally Blakely*, 542 U.S. at 332-33. In any event, we find no plain error in the district court's determination that Pawnell's proffer was reliable and that it alone was sufficient to establish by a preponderance of the evidence that Ellis possessed a firearm in furtherance of the conspiracy. Accordingly, we affirm Ellis's conviction and sentence.

### III.  Josiah Compton

Compton was convicted of possession with intent to distribute cocaine and crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(C), and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Compton's PSR determined that he had an offense level of forty and a criminal history category of VI, resulting in an advisory Guidelines range of 360 months to life imprisonment. The PSR counted uncharged drug amounts in determining Compton's relevant conduct to

reach the offense level of forty. To support the inclusion of the uncharged drug amounts as relevant conduct, the Probation Department relied on statements from three individuals and a confidential source, all of whom had purchased drugs from Compton, as well as statements from Compton's own proffer to the government. The criminal history calculation counted several prior convictions that dated from 1989 to 1999, which totaled thirteen criminal history points.

Compton objected to the calculations in the PSR, arguing that the information regarding the uncharged drug amounts was unreliable and that facts from his proffer could not be used to calculate his relevant conduct. He also asserted that the district court incorrectly included prior convictions that resulted in three points being added to his base offense level. The district court rejected these arguments, and subsequently sentenced him to 360 months' imprisonment.

On appeal, Compton makes four arguments: (1) that the district court erred in considering the uncharged drug quantity based on the various cooperators statements because those drugs were not part of the same course of conduct charged; (2) that the district court erred by using Compton's proffer against him at sentencing; (3) that the district court miscalculated his criminal history score by including some of his prior convictions; and (4) that he is entitled to resentencing in light of *Kimbrough v. United States*, ___ U.S. ___, 128 S.Ct. 558 (2007).

The government contends that Compton has waived his first argument regarding the use of uncharged drug

amounts in his sentencing calculation by failing to raise the argument below. In the district court, Compton challenged the reliability of the six sources of information as to his relevant conduct; he did not allege that the events to which those individuals implicated Compton were not part of the same course of conduct as the charged crimes, but the record does not reveal a knowing and intentional decision to forego any "same course of conduct" argument. *See United States v. McClellan*, 165 F.3d 535, 552-53 (7th Cir. 1999); *United States v. Patel*, 131 F.3d 1195, 2001 (7th Cir. 1997). Construing waiver principles liberally in favor of Compton, we find Compton merely forfeited the argument by failing to timely assert it. *Jaimes-Jaimes*, 406 F.3d at 848-49; *United States v. Sumner*, 265 F.3d 532, 539 (7th Cir. 2001) (citing *McClellan*, 165 F.3d at 552-53). Accordingly, we review for plain error. *Jaimes-Jaimes*, 406 F.3d at 848-49.

We find no error in the district court's inclusion of the various statements or calculation of uncharged drug quantities evidenced by the cooperators' statements that increased Compton's relevant conduct determination. *See United States v. Artley*, 489 F.3d 813, 822-23 (7th Cir. 2007). Giving broad discretion to the district court's explicit determination that the statements were reliable, we credit the district court's factual determinations regarding Compton's relevant conduct. *See United States v. Wilson*, 502 F.3d 718, 721 (7th Cir. 2007). Although the district court failed "to explicitly state and support its finding that uncharged drug quantities are sufficiently related to the offense of conviction[,] . . . [that] does not mean it failed to make the necessary finding." *Id.* at 723

(citing *United States v. Arroyo*, 406 F.3d 881, 889 (7th Cir. 2005)). "Relevant conduct can be used to enhance a defendant's sentence if it is part of the same course of action or common scheme or plan that gave rise to [his] conviction" and is established by a preponderance of the evidence. *United States v. McGowan*, 478 F.3d 800, 802 (7th Cir. 2007) (citing *United States v. Johnson*, 342 F.3d 731, 733 (7th Cir. 2003)). We consider significant similarity, regularity, and temporal proximity of the uncharged conduct with the convicted offense, as well as common victims, accomplices, purpose, or *modus operandi*. *See McGowan*, 478 F.3d at 802; *United States v. Ortiz*, 431 F.3d 1035, 1040 (7th Cir. 2005); *see also* U.S.S.G. § 1B1.3(a)(2), app. n.9. Where the defendant's convicted offense was merely the latest drug sale in an unbroken series of deals regularly made, that is sufficient to find the defendant's prior drug transactions were part of the same course of conduct as the offense of conviction. *Wilson*, 502 F.3d at 724.

In this case, Compton was steadily involved in dealing crack and powder cocaine in the same area from 1998 until his arrest in 2004. The government's sources confirmed this, documenting regular drug transactions between the sources and Compton from 2000 until 2004, totaling thirty-three ounces of crack cocaine. While the record lacks substantial evidence of Compton's particular drug transactions from 1998 until March 2000, amounts for this period were not included in the relevant conduct calculation. But there was sufficient testimony to establish that the course of illegal conduct began back then for purposes of determining when the offense that led to the conviction began. For example, one of the gov-

ernment's sources testified that Compton was one of the largest crack cocaine dealers in the Newport, Illinois area in 2000, so Compton probably established himself as such through regular drug transactions prior to 2000. Another source explained that he began buying cocaine from Compton in late 1999. Compton's PSR stated that he began receiving cocaine from one Marvin Williams in 1998, a fact to which Compton did not object. Based on this evidence, we find that Compton was engaged in continuous drug dealing, selling large quantities of powder and crack cocaine to regular customers at regular intervals in the same vicinity from 1998 until his arrest in 2004. Accordingly, we find no clear error in the district court's crediting the cooperators' statements for Compton's relevant conduct calculation.

So we turn to Compton's second argument on appeal—that the district court improperly relied upon information obtained from Compton's proffer to increase his base offense level. Compton complains that the government violated the terms of the proffer agreement by including 197 kilograms of cocaine in his relevant conduct calculation recommended by the PSR. Because the facts pertaining to the alleged breach are undisputed, we review the question of whether the government breached the proffer agreement *de novo*. *See United States v. Schilling*, 142 F.3d 388, 394 (7th Cir. 1998). We also review the district court's application of the Sentencing Guidelines *de novo* since Compton preserved the argument below. *United States v. Samuels*, 521 F.3d 804, 815 (7th Cir. 2008).

A proffer agreement is a binding contract, enforced according to its terms. *See United States v. Cobblah*, 118 F.3d 549, 551 (7th Cir. 1997). However, proffer agreements that are a part of ongoing criminal proceedings are " 'unique contracts and the ordinary contract principles are supplemented with a concern that the bargaining process not violate the defendant's rights to fundamental fairness under the Due Process Clause.' " *United States v. $87,118.00 in United States Currency*, 95 F.3d 511, 516-17 (7th Cir. 1999) (quoting *United States v. Rourke*, 74 F.3d 802, 805 (7th Cir. 1996)). We hold the government to "the literal terms" of the agreement, as well as the "most meticulous standards of both promise and performance" to insure the integrity of the bargaining process involved in proffers. *See Schilling*, 142 F.3d at 395 (internal quotations and citations omitted).

The fifth substantive paragraph of the proffer agreement provided that the government would not use any statements or other information provided by Compton against him in its case in chief, but that the government would "be free to provide any such information to any United States District Court in the event that [Compton] either pleads guilty or is found guilty later at trial [as is required to comply with Rule 32 of the Federal Rules of Criminal Procedure for sentencing decisions]." Yet the sixth substantive paragraph states:

> [N]o self-incriminating information given by [Compton] will be used to enhance the Offense Level against [Compton] except as provided in [Section 1B1.8 of the Sentencing Guidelines]. The government may,

however, use any statements made or other informa-
tion provided by [Compton] to rebut evidence or
arguments at sentencing materially different from
any statements made or other information provided
by [Compton] during the "off-the record" proffer or
discussion.

The Probation Department, a division of the government
bound by the terms of the proffer agreement, *see United
States v. Lezine*, 166 F.3d 895, 904 (7th Cir. 1999) (noting
that probation officers are an extension of the govern-
ment and officers of the court), recommended in the PSR
that 197 kilograms of cocaine be used to increase his
offense level as relevant conduct. The 197 kilograms of
cocaine was evidenced solely by Compton's proffer, and
the district court adopted the PSR's recommendation.
The government asserts that it properly provided this
information to the district court under paragraph five of
the agreement. Indeed, the agreement allowed the gov-
ernment to "provide" the information to the court for
sentencing purposes, but it was prohibited from "using"
the information to enhance Compton's offense level under
paragraph six. Under the proffer agreement, the govern-
ment could provide Compton's proffer statements to
the district court, but it could not per se recommend
that the court increase Compton's offense level based on
that information. To do so constituted a "use" prohibited
by paragraph six. By their very nature, paragraphs five
and six of the agreement are almost irreconcilable; short
of attaching the defendant's proffer statements to mate-
rials provided to the court for sentencing purposes, any
other mention of information obtained from the proffer

will likely violate the agreement. Be that as it may, under the circumstances of this case, the government violated the terms of the proffer agreement by submitting to the district court protected statements made by Compton.

The government also claims it properly used Compton's proffer to rebut his assertion that the government's sources were unreliable for purposes of calculating other relevant conduct drug quantities. This argument puts the cart before the horse, however, since Compton's objection to the reliability of the government's sources came *after* the PSR containing the information from Compton's proffer.

Compton was sentenced to 360 months' imprisonment. This sentence was at the bottom of his Guidelines range of 360 months to life imprisonment, calculated by including the 197 kilograms of cocaine as relevant conduct. Had the district court not considered the 197 kilograms of cocaine as relevant conduct, the Guidelines range would have been 324-405 months. Although the Guidelines are advisory, a district court must accurately calculate and consult the defendant's Guidelines range. *United States v. Thomas*, 520 F.3d 729, 736 (7th Cir. 2008). A sentencing based on an incorrect Guidelines range constitutes plain error and warrants a remand for resentencing, unless we have reason to believe that the error in no way affected the district court's selection of a particular sentence. *United States v. Garrett*, 528 F.3d 525, 527 (7th Cir. 2008); *United States v. Wallace*, 32 F.3d 1171, 1174 (7th Cir. 1994). The fact that Compton's sentence of 360 months is within his correct Guidelines range of 324-405 months is of no consequence. *See Wallace*, 32 F.3d at 1174 ("Al-

though the sentencing that the district court selected in this case is within the correct as well as the incorrect Guidelines range, we must remand unless we have reason to believe that the error did not affect the district court's selection of a particular sentence."). We have no reason to believe that the district court would not have selected an even lower sentence if given the opportunity to do so, thus, we must remand. *See Wallace*, 32 F.3d at 1174-75. Accordingly, Compton is entitled to be resentenced.

Despite Compton's entitlement to resentencing, we address his last argument to assist the district court upon resentencing.[3] Compton argues that the district court erred in calculating his criminal history category by including prior convictions dating from 1989 to 1999. We review the district court's fact-finding for clear error. *United States v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006). The government again argues that Compton has waived this argument since, at the district court, he elected to only challenge three points—two for committing the offenses of conviction while under a criminal justice sentence and one for a prior conviction from 1998. While we agree

---

[3]  Compton also filed a supplemental brief, arguing that he was entitled to resentencing in light of *Kimbrough v. United States*, ___ U.S. ___, 128 S.Ct. 558, 564 (2007), and *United States v. Taylor*, 520 F.3d 746, 748 (7th Cir. 2008). We need not address this argument since Compton is already entitled to be resentenced due to the government's breach of the proffer agreement and we trust that the district court will adequately consider the appropriate impact of *Kimbrough* and *Taylor* on Compton's sentence.

that Compton did not previously argue that some of his prior convictions are too old to count, we do not find the arguments strategically intertwined in a way that suggests knowing and intentional waiver. *See Jaimes-Jaimes*, 406 F.3d at 848. Accordingly, we give Compton the benefit of the doubt, and review the district court's fact-finding regarding when the offense of conviction began for plain/clear error. *Id.* at 848-49 ("Waiver principles should be construed liberally in favor of the defendant.") (citations omitted).

We need not dissect Compton's criminal history, however, since his arguments operate under the mistaken assumption that the offense of conviction began in 2004, not in 1998, as the district court correctly found. Because we have already determined that the offense of conviction was properly determined to have begun in 1998 and continued until Compton's arrest in 2004, all prior convictions challenged are proper under U.S.S.G. §§ 4A1.1(b) (calculating criminal history points) and 4A1.2(e)(2) (include prior sentences of imprisonment within ten years of the commencement of the instant offense). Additionally, the district court properly relied on information obtained from Compton's proffer to determine that the instant offense began in 1998; U.S.S.G. § 1B1.8(b)(2) provides that proffers are not off-limits when used for information "concerning the existence of prior convictions and sentences in determining § 4A1.1 (Criminal History Category) and § 4B1.1 (Career Offender)." We find no error in the district court's calculation of Compton's criminal history category.

**IV. Gerald Howliet**

Howliet was convicted of possession with intent to distribute cocaine base and heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and (b)(1)(C), and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Evidence against Howliet was obtained during the execution of a search warrant at Howliet's residence in Cahokia, Illinois. A magistrate judge issued the search warrant based on an affidavit signed by DEA Agent Larry Fox, which included the following information: Agent Fox had reason to suspect, based on information provided by two reliable confidential sources, that Howliet's cousin, Charles, sold the informants crack cocaine that he obtained from Howliet.[4] At the direction of law enforcement, both of the confidential sources purchased an ounce of crack cocaine from Charles, during which all conversations were recorded and Charles was driving a vehicle known to be used by Howliet. After these controlled purchases and again at the direction of law enforcement, one of the confidential sources ordered an eighth of a kilogram of crack from Charles, who told the source that it would take some time for him to obtain the drugs and that he would call the source when he was ready to complete the sale. Law enforcement maintained surveillance of Charles, who then went to Howliet's

---

[4] The affidavit explained that both of the sources had successfully completed multiple controlled purchases for the DEA (which field tested positive for cocaine) and that information provided by one of them had led to an arrest and a drug and currency seizure.

residence. Upon leaving Howliet's house, Charles drove to his apartment. The confidential source then called Charles to check the status of his drug order, who told the source he needed a few more minutes. Less than an hour later, Charles met the confidential source at a nearby restaurant, where they completed the crack cocaine transaction. During the exchange, Charles told the confidential source not to worry about a portion of the crack being a different color, explaining that it had just been prepared. Upon law enforcement's observation of the crack cocaine provided by Charles, the agents noted that approximately one half ounce of the crack was a different color and was packaged separately in a bag with condensation inside it. In light of this information, Agent Fox believed that Charles did not have the full amount of crack ordered by the confidential source, so he went to Howliet's residence to obtain additional cocaine, and then went to his apartment to "cook" the powder cocaine into crack cocaine. The DEA field tested the substance provided by Charles, which tested positive for cocaine.

Before the district court, Howliet argued that the evidence obtained from the search should be suppressed because the search warrant lacked probable cause. On appeal, Howliet makes this same argument, and also asserts that the good faith exception to the exclusionary rule should not apply because Agent Fox could not have reasonably believed that probable cause existed.

We review a district court's findings of historical fact for clear error and its legal conclusions *de novo*. *United States v. Garcia*, 528 F.3d 481, 485 (7th Cir. 2008) (citing

*United States v. McIntire*, 516 F.3d 576, 578 (7th Cir. 2008)). On the issue of whether the facts add up to probable cause, we give great deference to the judge who initially issued the warrant, but we give no weight to the district court judge's decision. *Id.* We will defer to the determination of the warrant-issuing judge that probable cause existed so long as "there is substantial evidence in the record supporting the judge's decision." *United States v. Koerth*, 312 F.3d 862, 865 (7th Cir. 2002).

"Probable cause is established when, based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *Garcia*, 528 F.3d at 485-86 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Jones*, 208 F.3d 603, 608 (7th Cir. 2000)). It requires only a probability, not absolute certainty, that evidence of a crime may be found. *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006). When the affidavit includes information supplied by an informant, we consider: "(1) the extent to which the police have corroborated the informant's statements; (2) the degree to which the informant has acquired knowledge of the events through firsthand observation; (3) the amount of detail provided; and (4) the interval between the date of the events and police officer's application for the search warrant." *Garcia*, 528 F.3d at 486 (citing *Koerth*, 312 F.3d at 866).

We agree that a reasonable judge could find that the affidavit here set forth sufficient facts to establish probable cause. The affidavit explained that Agent Fox

had worked with both confidential informants before, and had determined them to be reliable sources through numerous controlled purchases as well as an arrest and seizure of cocaine and drug money. It also stated that the DEA had field tested suspected drugs from the informants' controlled purchases and they tested positive for the presence of cocaine. Both informants had direct contact with Charles during which Charles sold them crack cocaine, and the transactions were monitored and recorded by law enforcement. The affidavit detailed the DEA's surveillance of the informants' interactions with Charles, which verified the information they obtained from the informants, in particular, that Charles needed time to obtain the cocaine requested by the informant, and that during that time he went to Howliet's house. The informants had already told the agents that Charles got his supply from Howliet, thus Charles's procession to Howliet's house after the informant requested a large quantity of cocaine corroborated that statement. Shortly after leaving Howliet's house, Charles met with the informant with freshly cooked crack cocaine. The warrant was issued on the same day as the events described in the affidavit. Thus, based on the facts presented to the warrant-issuing judge, there was substantial evidence to suspect that Charles had obtained cocaine from Howliet's house. Accordingly, the warrant was supported by probable cause.

Because the warrant was supported by probable cause, we need not address the good faith exception under *United States v. Leon*, 468 U.S. 897 (1984). The district court

did not err in admitting evidence seized from Howliet's residence, and his conviction is affirmed.

## V. Conclusion

For the foregoing reasons, we find no error in the convictions and sentences of Farmer, Ellis, or Howliet and therefore affirm all of their convictions and sentences. As for Compton, we affirm his conviction but vacate his sentence and remand for resentencing in light of the improper use of his proffer statements in the PSR, resulting in an incorrect Guidelines range. The district court is advised not to consider the 197 kilograms of cocaine discovered solely from Compton's proffer statements as relevant conduct; it may still consider various other relevant conduct, as described in greater detail but not accounted for in the PSR's recommendation. We also advise the district court to consider *Kimbrough* and its progeny upon resentencing Compton.