In the

# United States Court of Appeals
### For the Seventh Circuit

No. 18-2948

TERRY L. SMITH,

*Plaintiff-Appellant,*

*v.*

ILLINOIS DEPARTMENT OF TRANSPORTATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-02061 — **Edmond E. Chang**, *Judge.*

ARGUED MAY 30, 2019 — DECIDED AUGUST 21, 2019

Before FLAUM, MANION, and BARRETT, *Circuit Judges.*

BARRETT, *Circuit Judge.* After a rocky probationary period, the Illinois Department of Transportation discharged its employee Terry Smith. Smith sued the Department under Title VII, arguing that it had subjected him to a hostile work environment and fired him in retaliation for his complaints about racial discrimination. The district court granted summary judgment to the Department on both claims, and Smith insists that it was wrong to do so. He contends that the district court

mistakenly concluded that testimony from two of his witnesses was inadmissible and that he has enough evidence to make it to a jury in any event. We disagree and affirm the district court.

## I.

Smith began working as an Emergency Traffic Patrol Minuteman with the Department late in 2013. Minutemen perform various duties related to traffic and roadways. Smith's employment began with a probationary period starting August 1. To be certified, he had to successfully complete three stages of training over the course of six months. His probationary period did not go well.

According to the Department, Smith was far from a model employee. Early in his training, one of his supervisors reported that he challenged the instructions that he was given, which created a "serious issue" for his training and development. Another supervisor said that Smith regularly "fail[ed] to remember info" and "ha[d] a very hard time following basic instructions." Particularly troubling, however, was Smith's record of unsafe conduct. Once, while driving in an express lane with Marcello Valle, one of his supervisors, Smith approached a place where the lanes divided. Valle told him to pick a lane; instead, Smith stopped short in traffic— only thirty feet from the concrete pillar dividing the lanes. On another occasion, Smith drove away from a gas pump with the nozzle still inserted in the truck. Smith also "almost hit a trooper police car" on a drive with a supervisor. Most dangerous of all, Smith ignored instructions to put his truck in neutral and pull the brake—nearly causing a supervisor to be pinned between the tow truck and another vehicle. Incidents like these led one of his supervisors, Lloyd Colbert, to send an

email to some of his coworkers warning that if Smith continued to work on the road, "someone else will pay the ultimate price."

The Department gave Smith negative reviews from the beginning, and its assessments of his performance became progressively worse. In a performance evaluation in mid-September, Smith received two marks of "unsatisfactory." In October, one of Smith's supervisors emailed another saying that Smith was "not getting any better and cannot get it." By the end of November, Smith was described as "very behind" where he ought to have been at his stage of training. The problems continued into December: emails between the Department employees described him as being argumentative, unstable, reckless, unsafe, and "in no way ready to go on his own." In January, Smith received another performance evaluation, this one giving him unsatisfactory marks in five different categories.

From Smith's perspective, however, the Department was the problem. On August 22, 2013, he filed an internal complaint with the Department asserting that Valle had used "abusive language" toward him and that another supervisor, Zen McHugh, had threatened to fire him for being confrontational. That same day, Smith also wrote a memorandum to his union representative in which he claimed that the Department had discriminated against him because he was black and had subjected him to a hostile work environment. In October, Smith sent another memorandum to the Department. The subject line was "Illegally docked hours from my pay. Discrimination/harassment." The memorandum claimed that on October 13, Colbert had told him to sign out two hours before he had stopped working, which had the effect of

withholding two hours of pay from his paycheck. (He was eventually compensated for those hours.)

In December, Smith wrote more memoranda to the Department complaining about his treatment. Two of them, dated December 5 and 6, complained that Colbert had denied Smith overtime pay after he responded to a call for assistance with a disabled vehicle late in his shift. He attributed the refusal to racial discrimination, harassment, and retaliation. He submitted two more memoranda in late December. He addressed the first—which had the subject line "discrimination retaliation"—to a supervisor at the Department. In it, he claimed that he was being treated differently than a fellow employee who had been allowed to work only four hours on a certain day while Smith had been required to work a full day. The second was also addressed to the Department, and it requested a shift change due to "discrimination, harassment, retaliation."

On December 31, 2013, Smith filed another complaint, this time with the Department's internal Equal Employment Opportunity office. He listed three dates on which the Department had allegedly discriminated and retaliated against him: October 13, December 5, and December 28. From the record, we know that each of those dates corresponds to a specific incident. On the first date, Colbert had allegedly docked hours from his paycheck. On the second, Colbert had allegedly denied Smith overtime pay. On the third, Roman McGhee, a supervisor, had supposedly yelled and sworn at Smith for saying that he was going to back two cars that had been in an accident down a highway ramp. Smith's complaint did not offer his side of those events; it simply stated that he had been

treated differently than another coworker and denied over-time pay.

On January 3, 2014, the Department sent Smith a "State-ment of Charges," which sought to fire him on the ground of his unsatisfactory work performance. On January 16, Smith had a run-in with Colbert, who had recently learned that Smith had charged him, along with other supervisors, of ra-cial discrimination and retaliation. According to Smith, Col-bert, who was also black, was "very angry" and made several confrontational remarks: that there would be "eighty-one of us against one of you when we go to trial"; that Smith was going to lose everything that he owned, including his house and car; and that he was a "stupid ass ni[]."

The Department terminated Smith on January 30, 2014. In March, Smith sued the Department under Title VII, alleging that it had subjected him to a hostile work environment and fired him in retaliation for his complaints about racial dis-crimination. The district court granted summary judgment to the Department, concluding that Smith had not introduced enough evidence to permit a jury to decide in his favor on ei-ther claim.[1]

Smith insists that the district court took several wrong turns. To begin with, he contends that the court erroneously excluded the testimony of two of his witnesses—Maria Ve-ronico, an expert, and Marvin Harrison, a former

---

[1] We note that Smith's counsel failed to include the district court's opinion in the appendix as required by Circuit Rule 30(a)—notwithstand-ing his certification that he had done so. We do not take either the omis-sion or the misrepresentation lightly, and counsel is admonished to ob-serve our rules in the future.

supervisor—as inadmissible. But even if we disagree with him about that, Smith says, he still has enough evidence to make it to a jury on both his retaliation and hostile work environment claims. We discuss each of his arguments below.

## II.

We begin with the admissibility of Veronico's expert testimony, on which Smith relied in his opposition to the Department's motion for summary judgment. Veronico, an expert in industrial relations, testified at her deposition that Smith's trainers had created a hostile work environment based on his race when they "scolded, ridiculed, and threatened" him; she also opined that the Department had fired Smith for complaining about racial discrimination. The district court declined to consider Veronico's opinion, explaining that it was not based on "sufficient facts or data" as required by Federal Rule of Evidence 702(b). That decision was well within the district court's discretion.

Veronico concluded that Smith had been subjected to a hostile work environment after reading Smith's evaluations and portions of the Department's training manual and Employee Policies Manual. She admitted that even though it was her usual practice to interview actors on both sides of a discrimination claim, she did not talk to either Smith or his supervisors. Indeed, she did not even bother to review any sworn deposition testimony. By Veronico's own admission, her conclusion was based on an incomplete picture—as the district court put it, she "omitted a substantial set of facts from her analysis, and instead relied only on what appears to be plaintiff-curated records." Veronico's reliance on an anemic and one-sided set of facts casts significant doubt on the soundness of her opinion, and the court did not abuse its

discretion by excluding it. *See Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084, 1086 (7th Cir. 1999) (excluding an expert who "did not attempt to reconstruct the underlying facts to determine whether [the opposing party] had a good explanation … [and] did not do *anything* except talk to [the plaintiff], read documents [plaintiff's] counsel sent, and write a letter").

Veronico's opinion that the Department retaliated against Smith for registering complaints of racial discrimination rests on even shakier ground. That conclusion was drawn from the same incomplete information that formed the basis of her opinion about Smith's hostile work environment. But the opinion about retaliation was undermined still further by Veronico's inability to connect the conclusion that she drew to the facts that she had. We have explained before that "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Veronico's testimony lacked that link. She maintains that Smith's evaluations became more negative after he filed his complaints—which might suggest a retaliatory motive that could have inspired his dismissal. But she admitted that she had no information about whether any of these supervisors even *knew* about Smith's complaints at the time that they submitted negative evaluations of his performance. And if the supervisors were unaware of the complaints, there would be no reason to suspect that their negative evaluations demonstrated any kind of retaliatory motive. In short, Veronico's opinion was fundamentally flawed, and we affirm the district court's decision that it was inadmissible.

## III.

We now turn to the admissibility of an affidavit sworn by one of Smith's supervisors, Marvin Harrison, who said several things that were helpful to Smith. The district court ruled that Harrison's affidavit was inadmissible because it lacked a proper foundation and was "replete with generalized assertions." For instance, the affidavit states that Harrison "witnessed [Smith] being discriminated against on many different occasions by the department and its agents." But without knowing who discriminated, what they did, and when they did it, the court had no way of knowing what to make of this evidence. The same problem plagues the affidavit's assertion that Colbert called Smith the n-word "frequently." Harrison did not specify whether he heard these slurs himself, nor did he offer any detail about the contexts in which they were uttered. Without that information, the court could not evaluate whether Harrison was describing events of which he had personal knowledge or simply relaying inadmissible hearsay. *See* FED. R. CIV. P. 56(c)(4) (requiring that affidavits used to support or oppose a motion for summary judgment be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"). Indeed, the affidavit was so vague that even Smith himself concedes that it is at least "partially true" that it "lacked a proper evidentiary foundation." The district court did not abuse its discretion in declining to consider Harrison's affidavit.

## IV.

To survive summary judgment on his Title VII retaliation claim, Smith must show that a reasonable jury could find that he engaged in a protected activity, that he suffered an adverse

employment action, and that the adverse action was motivated by a protected activity. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). The Department concedes that Smith engaged in protected activity and that the termination of his employment was an adverse employment action. The only dispute is whether the Department terminated Smith because he complained about racial discrimination. We agree with the district court that a reasonable jury could not find in Smith's favor on this issue.

To raise an inference that he was fired because of his complaints rather than because of his performance, Smith maintains that he was fired even though he was meeting the Department's legitimate expectations. *See Vaughn v. Vilsack*, 715 F.3d 1001, 1006 (7th Cir. 2013). Yet as we recounted above, Smith's tenure at the Department was distinguished in all the wrong ways. He received multiple ratings of "unsatisfactory" in two different formal performance reviews. His failings as an employee were chronicled in conversations and emails from a number of different supervisors and coworkers, who considered him unsafe, argumentative, and unable to follow instructions.

Smith does not dispute the Department's long list of grievances against him. But he argues that the district court "cherry picked" negative evidence about his employment record to create a misleading narrative. He points out that in addition to bad reviews, he also received some positive feedback from some of his supervisors at the Department. But a smattering of decent reviews doesn't overcome the overwhelming number of documented problems—including serious safety issues—that the Department had with Smith's performance. *See Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125 (7th Cir.

1994) ("The mere submission of materials from a co-worker or supervisor indicating that an employee's performance is satisfactory … does not create a material issue of fact."). Given the extensive evidence that Smith was not meeting his employer's legitimate expectations, a reasonable jury could not find that the Department fired him because of his protected activity rather than for his poor performance.

V.

Finally, we address Smith's hostile work environment claim. A hostile work environment claim contains four elements: (1) the employee was subject to unwelcome harassment; (2) the harassment was based on a reason forbidden by Title VII—here, race; (3) the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile or abusive working environment; and (4) there is a basis for employer liability. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 834 (7th Cir. 2015).

Smith's case largely founders on the second prong, because the majority of the harassment he identifies was unconnected to his race. Smith says that Valle, McGhee, and a trainer identified only as "Washington" created a hostile work environment by directing profanity at him. Valle confronted him and used the f-word several times, in contexts like "shut the f[] up." McGhee called Smith a "stupid dumb motherf[]" and told him he was going to "kick [his] ass." Washington used the f-word once. As the district court pointed out, however, Smith fails to connect any of these epithets to his race. Smith himself acknowledged that Valle was "equal opportunity" when it came to dishing out profanity. McGhee's outburst was connected to a dangerous traffic

situation for which Smith was responsible. And Washington's lone use of the f-word is presented without any context at all. While the epithets may have made for a crude or unpleasant workplace, "Title VII imposes no 'general civility code.'" *Vance v. Ball State Univ.*, 570 U.S. 421, 452, (2013) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). Because Smith introduced no evidence that his supervisors swore at him because he was black, the profanity that he describes does not establish a hostile work environment under Title VII.

Smith describes one incident, however, that plainly constitutes race-based harassment: Colbert, one of his former supervisors, called Smith a "stupid ass ni[]" after finding out that Smith had filed a complaint with the Equal Employment Opportunity office. The n-word is an egregious racial epithet. *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) ("[W]hile there is no 'magic number of slurs' that indicates a hostile work environment, an 'unambiguously racial epithet falls on the more severe end of the spectrum.'" (citation omitted)). That said, Smith can't win simply by proving that the word was uttered. He must also demonstrate that Colbert's use of this word altered the conditions of his employment and created a hostile or abusive working environment. *Huri*, 804 F.3d at 834. And he must make this showing "from both a subjective and an objective point of view." *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018). In other words, he must show not only that a reasonable person would find the workplace hostile or abusive as a result of Colbert's slur, but also that he himself perceived it that way. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

We need not address the objective prong of the analysis, because Smith falters on the subjective prong. He introduced no evidence that Colbert's use of the n-word changed his subjective experience of the workplace. To be sure, Smith testified that his time at the Department caused him psychological distress. But that was for reasons that predated his run-in with Colbert and had nothing to do with his race. His tenure at the Department was rocky from the outset because of his poor track record. He clashed with his supervisors over pay, and they confronted him with foul language. As early as August—the first month of his employment—he sent memoranda to the Department complaining of a "hostile work environment." On Smith's own account, his supervisors made him miserable throughout his employment at the Department. But as we have already discussed, he has no evidence that his supervisors were lashing out at him because he was black.

The first incident in which race played a part was his January 16th run-in with Colbert. By then, things were already at a breaking point. The Department had initiated termination proceedings against Smith two weeks before, so he knew that he was about to be fired. And while things certainly could have gotten worse for Smith after the racially charged confrontation with Colbert, he offers no evidence that they did. Instead, Smith presents the confrontation as yet another instance of the same ill treatment that he had been receiving all along.

That won't do under Title VII. Because the statute does not give employees a remedy for workplace abuse unrelated to a protected characteristic, Smith needs to point to evidence—even if in his own testimony—that he suffered harm from Colbert's race-based harassment that was distinct from the

distress that non-race-based harassment was already causing him. Put differently, Smith has to be able to persuade a jury that Colbert's race-based harassment was severe enough "to *alter* the conditions of [his] employment." *Huri*, 804 F.3d at 834 (emphasis added). Smith did not even try to make that showing—he points to no evidence that Colbert's slur caused him either additional or different distress. Without evidence that Colbert's outburst changed Smith's subjective experience during his last two weeks at the Department, a reasonable jury could not resolve the hostile work environment claim in Smith's favor.

*\*\*\**

The district court's grant of summary judgment to the Department is AFFIRMED.