In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-3200

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JESUS MALAGON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17 CR 326 — **Elaine E. Bucklo**, *Judge.*

ARGUED NOVEMBER 8, 2019— DECIDED JULY 9, 2020

Before SYKES, *Chief Judge,* and RIPPLE and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. A jury convicted Jesus Malagon of conspiracy with intent to distribute cocaine and possession of cocaine with intent to distribute, 21 U.S.C. §§ 846, 841(a)(1). The district court imposed a below-Guidelines sentence of 60 months' imprisonment, which reflected the statutory minimum. Malagon now appeals the conviction, arguing that the district court improperly admitted testimony, which tainted

the conviction. He asserts that absent the improperly admitted testimony, there was insufficient evidence to support the conviction.

At trial, the government introduced cell phone records, audio and video recordings and their transcripts, as well as witness testimony, including from undercover officers. The evidence centered around two meetings which took place at the home of Edilberto Ramirez-Sanchez. The first occurred on May 11, 2017. In recorded telephone conversations prior to that meeting, Ramirez-Sanchez told the informant that his "buddy" would arrive in ten minutes. Tr. Transcript Vol. 1 at R. 127, p. 88. Ramirez-Sanchez agreed with the informant's request that he call the informant when he had the "part," and later that day did so, telling the informant that he had "already opened the part" and would wait for the informant at his home. *Id*. at 92. The informant and DEA Task Force Officer Mario Elias met Ramirez-Sanchez at his home, and Ramirez-Sanchez took them into his garage and showed them a half a kilogram of cocaine. Ramirez-Sanchez told them he was going to bring "one," but was told they wanted "half," so his "buddy" split it, and said "[h]ey, look at the quality." *Id*. at 114. They discussed a price of $18,000 for the "half" or $34,000 for a "whole one." *Id*. at 106. Ramirez-Sanchez engaged in phone calls with the defendant both before and after that meeting.

The second meeting that formed the crux of the case against Malagon occurred at Ramirez-Sanchez' residence on May 17, 2017, involving a transaction for two kilograms of cocaine. Prior to that meeting, the informant again engaged in a number of recorded telephone conversations with Ramirez-Sanchez confirming that his "buddy" was ready and the "two

parts" were already ready, and with Ramirez-Sanchez seeking confirmation from the informant that he had "everything ready … all the tickets." *Id*. at 152. The informant and DEA Task Force Officer Angel Amador, posing as Elias' partner, arrived at the Ramirez-Sanchez residence at around 4:00 in the afternoon, and Malagon was waiting there in the backyard. Malagon told them "don't worry, twenty minutes," and when Amador expressed frustration at the wait, Malagon responded that the next time he would know that they are safe or trusted people and would have "the cars ready" so that Amador could "arrive, check it, and leave." *Id*. at 173–74, 176, 178, 181–83. At one point, Malagon received a phone call and following the call he told Amador that he "called all the way down right now," that he "called to little Mexico, to make sure that this happens, that this doesn't fail." *Id*. at 188.

After waiting for another hour, Amador again complained about the delay, and he and the informant left temporarily to get food. After they left, surveillance officers saw Malagon leave the residence in a black Toyota. DEA Task Force Officer Donald Stone followed him and observed Malagon driving in a zig-zagging pattern. At one point, Malagon pulled over, engaged his hazard lights, and opened the trunk of his car. He then walked to the front of the car with a blue and white cooler, lifted the hood of the car, and then closed the hood and placed the cooler in the trunk of the car. Immediately following those actions, he drove back to Ramirez-Sanchez' residence, removed the cooler from the trunk of the car, and brought the cooler into the residence. Ramirez-Sanchez called the informant at the restaurant and the informant and Amador returned to the residence. Malagon led Amador, the informant, and Ramirez-Sanchez into the garage, and in the garage they observed two kilograms of cocaine on a table

wrapped in blue and gray tape. The informant wore an audio-video recording device which captured the defendant at various points. Inside the garage, Malagon handled the kilogram packaging and stated "there it is," "what I say? what I say?," and told them it was "guaranteed" and that "if you have any problem, you all come and tell me what you want." *Id*. at 194, 196–98. Malagon then told them he would leave them there and to "call me when you have the money." At that point, surveillance officers moved toward the garage. Hearing them, Malagon tried to hide the cocaine by the wall. Officer Stone who entered the garage observed the kilograms against the garage wall and the blue cooler that Malagon had previously been observed carrying. They arrested Malagon, and on one of his cell phones that they seized, they found a photograph of the two kilograms of cocaine with blue tape.

Malagon argues that DEA Agent Reynolds was improperly allowed to present expert testimony as to drug trafficking practices and the use of drug code, and that DEA Task Officer Amador was improperly allowed to present lay opinion testimony. He asserts that, absent the problematic testimony, the evidence against him was largely circumstantial and would not necessarily have resulted in a conviction.

Prior to trial, the government informed the court and defense counsel that it intended to call a drug trafficking expert to testify about use of coded language, the price of cocaine in the Chicago area, and common tactics used by drug traffickers. Malagon filed a motion in limine seeking to bar any law enforcement witness from testifying as to unrecorded conversations outside their direct observations but raised no other objection to the testimony and never objected to the expert witness testimony by Reynolds. Accordingly, we review the

objection on appeal only for plain error. Under the plain error standard, Malagon must demonstrate an error that was not intentionally waived, which was plain and affected his substantial rights, and that the error affects the fairness, integrity or public reputation of the judicial proceedings. *United States v. Thomas*, 897 F.3d 807, 812 (7th Cir. 2018). Malagon's challenge to Reynolds' testimony cannot meet that standard. In fact, he fails to meet the first requirement—that of demonstrating that an error occurred.

Malagon points out that in *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003), we recognized that "[i]t is critical under [Federal Rule of Evidence] 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." See also *Smith v. Illinois Dep't of Transportation*, 936 F.3d 554, 559 (7th Cir. 2019). Malagon argues that the district court erred in allowing Reynolds to testify as to the meaning of code words based on his experience as a law enforcement officer, without requiring Reynolds to explain his methodology and link his conclusions to his experience. "We have routinely held that 'narcotics code words are an appropriate subject for expert testimony.'" *United States v. York*, 572 F.3d 415, 421, (7th Cir. 2009), citing *United States v. Farmer*, 543 F.3d 363, 370 (7th Cir. 2008). According to Malagon, however, Reynolds "never once pointed to his training or experience as a basis for his conclusion that certain words in the transcripts actually meant cocaine, let alone explained how his experience led to the conclusions that he reached." Appellant's Brief at 24. That is not an accurate representation of Reynolds' testimony. Reynolds testified as to the use of code language by drug traffickers, explaining that very rarely will drug traffickers use the term "cocaine." Tr. Transcript Vol. 2 at R. 128, p. 325. Instead, he

noted that they routinely substitute code words to reference drugs and drug quantities in order to conceal their activities because they recognize the potential that the conversations are being recorded. *Id*. Reynolds testified that in his work as a special agent and group supervisor, he was involved in hundreds of narcotics-related investigations and was familiar with codes used in such transactions and with drug prices in the Chicago area. *Id*. at 327. Reynolds testified how the context of the language used in the conversation over the course of the investigation can indicate that the words are drug code, and that such words can vary such as the buyer or seller asking for "work"—where "work" references drugs—or referring to instruments such as guitars to represent drugs. *Id*. at 340. Reynolds noted, for instance, that in one investigation the person repeatedly discussed "guitars, and they were watching the person and knew he was not a musician or guitar teacher, and over time it became apparent that the word "guitar" was code for drugs—which was further confirmed when they seized a kilogram of cocaine which had the imprint of a guitar on it. *Id*. at 340–41. He noted that code words were also used to discuss the price of narcotics, including the same words such as "work," or other words such as "tickets" or "dough." *Id*. at 341. Similarly, in discussing the quantity of narcotics to be sold, he testified that in his experience they typically would use words like "work," "pieces," or "parts" to refer to kilograms. *Id*. at 342. He then testified that he read the transcripts of the conversations in this case, and that based on his training and experience, he formed the opinion that the parties were discussing narcotics. *Id*. at 343. He specifically noted that the word "part" was used for drug code to reference narcotics being delivered. *Id*. at 344–45. He pointed to factors such as the repetition of the word, referring to the

same thing over and over, and the context of the word. *Id*. at 346. As to the context, for instance, Reynolds noted that in the conversation the statement "I already … opened the part and it's, yes, yes, it's that one, the one I tell you," used language that he typically hears as far as kilogram quantities where it is opened to verify the quality of the narcotics. *Id*. Similarly, he concluded that the query "[d]o you already have everything … ready, all arranged? All the tickets?" was drug code in that "tickets" referenced the payment for the narcotics. *Id*. at 347. Malagon mistakenly believes that Reynolds' opinion is not based on his training and experience because he relies on the context and recurrence of words in determining whether they reflect drug code, but Reynolds testified that based on his training and experience, the context and recurrence are used in determining whether the words are drug code. Just as the repeated discussion of "guitars" by a person with no apparent connection to musical instruments indicated an alternative meaning for the word, the repeated discussion of the delivery of parts and cars in this case signaled drug code where the context and surrounding language mirrored that of drug transactions, and the recurrence indicates that the reference is to something other than actual automotive-related transactions. The argument here—that Reynolds "never once pointed to his training or experience as a basis for his conclusion that certain words in the transcripts actually meant cocaine, let alone explained how his experience led to the conclusions that he reached"—is belied by Reynolds' trial testimony in the record.

Malagon's other evidentiary challenge is also unavailing. He asserts that the district court improperly admitted the opinion testimony of Amador even though he was a lay witness and not an expert witness, in contravention of Federal

Rule of Evidence 701. Rule 701 provides that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

Malagon challenges Amador's testimony relating to the meaning of words Malagon used in a conversation with Amador, including, for instance, the word "cars" as referring to kilograms of cocaine and "next time" as meaning the next order for cocaine. Amador's understanding of the meaning of the words used in those conversations to which he was a party fall within the proper scope of lay testimony, and there was no error in allowing the admission of the testimony. Malagon argues that, as we recognized in *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011), a law enforcement officer's testimony is a lay opinion if limited to that officer's observations or other facts derived exclusively from a particular investigation, whereas it is expert testimony if the officer brings the wealth of his experience as an officer to bear on those observations and makes connections based upon that specialized knowledge. See *id*. at 582, citing *United States v. Oriedo*, 498 F.3d 593, 603 (7th Cir. 2007). In *Gaytan*, the officer testifying was not a party to the conversation but rather listened to a recording of the conversation, and we held that his familiarity with the terminology could have been attributable to the Gaytan investigation in particular or to his training and experience as a narcotics officer in general. *Id*. In contrast, Amador testified as to the meaning of the words used in a conversation between himself and Malagon. As a party to the conversation, his testimony as to the meaning of the words used by the

parties in the conversation falls within Rule 701 as lay testimony in that it is rationally based on his perception as a witness and helpful to understanding his testimony and determining a fact in issue. Nothing in his testimony indicates that his testimony is based on specialized knowledge, as opposed to his understanding of the conversation as a participant in it. Because there is no basis to conclude that Amador provided expert as opposed to lay testimony, Malagon has failed to demonstrate that the district court committed plain error in allowing such testimony.

We note that, even if Malagon had succeeded in establishing plain error, any such error would be harmless. The challenged testimony addressed whether Malagon was referring to cocaine in his discussions, but any possible ambiguity as to whether the words referred to a narcotics deal was set to rest when Malagon brought Amador and the informant into the garage to reveal the two kilograms of cocaine and referred to it as the promised delivery.

The decision of the district court is AFFIRMED.