2023 IL App (1st) 211540-U

No. 1-21-1540

Order filed January 20, 2023

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| GLENN BOONE, | ) | Petition for Direct |
| | ) | Administrative Review of a |
| Petitioner-Appellant, | ) | Decision of the Illinois Human |
| | ) | Rights Commission. |
| v. | ) | |
| | ) | |
| THE HUMAN RIGHTS COMMISSION, | ) | Charge No. 2020 CE 1823 |
| THE DEPARTMENT OF HUMAN RIGHTS, and | ) | |
| INGRAM MICRO, INC., | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Oden Johnson and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the decision of the Illinois Human Rights Commission sustaining the Department of Human Rights' dismissal of petitioner's charge of discrimination and retaliation based on a lack of substantial evidence.

¶ 2    Petitioner Glenn Boone appeals, *pro se*, from a final decision of the Human Rights

Commission (Commission) that sustained the Department of Human Rights' (Department)

dismissal of his charge of discrimination and retaliation for lack of substantial evidence. For the reasons that follow, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4      On January 22, 2020, petitioner filed a *pro se* charge of discrimination and retaliation with the Department. In the charge, petitioner alleged that his employer, Ingram Micro, Inc. (Ingram), subjected him to racial harassment during his employment (Count A), discriminated against him by not hiring him for a full-time position and terminating his temporary assignment due to his "race, Black" (Count B), and discriminated against him by not hiring him for a permanent, full-time position in retaliation for having complained about the discrimination (Count C).

¶ 5      The Department investigated the charge. According to the investigator's report, Ingram, a technology distributor and supply-chain services provider, contracts with SureStaff, Inc. (SureStaff), to provide temporary employees for Ingram's facility in Carol Stream, Illinois. On or about July 26, 2019, SureStaff placed petitioner with Ingram as a senior logistics associate.[1] On January 17, 2020, petitioner's temporary assignment ended at the close of business.

¶ 6      Petitioner alleged that from about August 2019 through January 2020, he was harassed by another senior logistics associate, Ricardo Blanco, due to his race, black. He asserted that the conduct created a hostile work environment which interfered with his ability to perform his job. He alleged that similarly situated non-black employees were treated more favorably. Petitioner further alleged that he was not hired for full-time employment in December 2019 due to his race. He believed he met all the prerequisites for full-time employment and claimed that the position

_____

[1] In his brief on appeal, petitioner specifies that he worked as a runner/forklift driver in the shipping and receiving area.

was given to a less-qualified, non-black individual. Finally, petitioner alleged he was not hired for a permanent, full-time position in retaliation for complaining internally about discrimination. He claimed that the adverse action followed his involvement in a protected activity within such a period of time so as to raise an inference of retaliatory motivation.

¶ 7       Ingram denied that petitioner was subjected to harassment or differential treatment due to his race and denied that similarly situated non-black employees were treated more favorably. Ingram's articulated non-discriminatory reason for not hiring petitioner for a full-time position was that the company had a sufficient number of full-time senior logistics associates in the receiving department and did not have a business need for additional employees in that position. Ingram maintained that petitioner never applied or interviewed for any full-time position during his temporary assignment.

¶ 8       According to the investigator's report, petitioner stated he and his brother were assigned to Ingram's receiving department. Blanco was assigned to train new employees by observing them on the job, providing instruction, and demonstrating the proper methods for performing various job duties. Petitioner stated that he and his brother[2] were subjected to harassment by Blanco, who was not black, and that the harassment started "immediately." Blanco inquired whether petitioner was Hispanic, and petitioner responded that he was not.

¶ 9       Petitioner stated that he was subjected to disrespectful behavior and inappropriate language by Blanco. Specifically, Blanco would often admonish his performance with profanity-based

_____

[2] Petitioner's brief includes a copy of his text message exchange with Norman Slaughter of the Illinois Department of Human Rights wherein petitioner inquires as to how his brother received a right to sue letter but Petitioner's claims were dismissed. Petitioner did not attach the right to sue letter to his brief.

language. During training and while providing instruction, Blanco would often state, "[Y]ou are f***ing up," or make insulting comments such as, "[A]re you a f***ing idiot?" On multiple occasions when petitioner and his brother were attempting to take a break, Blanco would inquire, "[W]here the f*** are [you] guys going?" Petitioner stated that he trained with Blanco for about one or two weeks and had occasional interactions with him after the conclusion of his training. Blanco scrutinized him and wrongly accused him of putting products in the wrong location. Once, Blanco instructed petitioner "to stay on your f***ing side of the warehouse."

¶ 10    Petitioner told the investigator that he complained about Blanco's behavior to his immediate supervisors, Frank Padula and Christine Coglianese. He made his initial complaint during the first or second week of his assignment and complained on multiple occasions that Blanco's conduct had persisted. After making multiple complaints, he was treated with deliberate indifference and ignored by Ingram's staff. He was told that Blanco had close, friendly relationships with members of the human resources department.

¶ 11    On January 17, 2020, he complained to Erica Garcia, a SureStaff representative, via text message. Petitioner "was told that Blanco subjects everyone to the same treatment." Petitioner told the investigator that he also reported being subjected to discrimination and harassment in his SureStaff interview form on January 17, 2020, at the conclusion of his assignment. The form included the following statements by petitioner:

"The company HR Department discriminates against black employees and unfair

treatment and retaliated against black employees. However, working with the

employees is good. Good people. *** The co-workers were good to work with, the

environment was good. The communication with some managers was off. Noticed right away no African Americans in the Department."

¶ 12    Petitioner believed he was harassed due to his race. He was told by other black employees that Blanco had an "antipathy to black people" but conceded that he never heard Blanco make derogatory comments or statements pertaining to his race. He observed Blanco treat Hispanic employees with respect and courtesy and stated that Blanco treated Hispanic employees more favorably.

¶ 13    Petitioner stated he was not offered full-time employment at the conclusion of his temporary assignment at Ingram. He conceded that he never applied or interviewed for a full-time position. He "concluded that all prerequisites were realized for full-time employment." Around December 2019, he was notified by a human resources representative, Marisol Rivera, that he was not being considered for a full-time permanent position. He believed he was not offered full-time employment due to his race. He stated that Ingram's workforce appeared to be disproportionately Hispanic and speculated that this was a result of bias. Petitioner further believed that he was not offered full-time employment in retaliation for engaging in protected activity, *i.e.*, complaining to Rivera in August 2019 that he was being harassed by Blanco due to his race. Petitioner stated that this adverse action by Ingram followed his involvement in a protected activity and, therefore, raised an inference of retaliatory motivation.

¶ 14    Ingram provided the investigator with copies of company policies regarding non-discrimination and harassment. Its non-discrimination policy stated it was committed to a workplace free from harassment and discrimination based on, among other things, race. The policy applied to hiring and employment practices, including wage payments, promotions, rewards, and

access to training. Ingram's harassment policy stated that harassment and discrimination against persons of protected classes were prohibited. In a section titled "retaliation prohibition," the policy stated that no person "shall be subject to adverse action because he or she reports an incident of harassment, provides information, or otherwise assist[s] in any investigation of a harassment complaint" and that Ingram would not tolerate retaliation against anyone who, in good faith, reported or provided information about harassment. Ingram also provided the investigator with a copy of the welcome letter for temporary employees.

¶ 15   Julia Barrow, a senior human resources employee at Ingram, told the investigator that on July 26, 2019, SureStaff placed petitioner at its Carol Stream facility as a senior logistics associate. Blanco, who was also a senior logistics associate, was assigned to train the temporary workers, including petitioner, for the first few weeks of their assignments. Blanco trained petitioner by observing him on the job, providing instruction, and demonstrating the proper method for performing particular job duties. According to Barrow, Blanco, in his capacity as a senior logistics associate, was not considered to be managerial or supervisory staff.

¶ 16   Barrow stated that there was no record of petitioner reporting harassment or disparate treatment, engaging in any protected activity, or complaining of racial discrimination. When he attended orientation on August 7, 2019, he was informed how to report harassment and discrimination. He also could have reported harassment to SureStaff, but there was no record of him having done so.

¶ 17   According to Barrow, Ingram provides all temporary workers with a welcome letter during orientation that explains the requirements for conversion to full-time employment and states that conversion is not guaranteed. The letter explains that a temporary employee must work a minimum

number of hours for the temporary placement agency, and that Ingram decides whether to hire workers full-time based on business needs, attendance, productivity, quality of work, attitude, safety, and overall performance.

¶ 18    Barrow stated that in January 2020, Ingram had a sufficient number of full-time senior logistics associates in the receiving department and did not have a business need for additional employees in that position. Petitioner's temporary assignment ended on January 17, 2020, when Ingram ended the assignments of over 100 temporary workers from about four staffing agencies. Although Ingram does not maintain employment personnel files for temporary workers, Barrow was able to identify the names and job titles of the temporary workers whose assignments ended in January 2020. At least seven individuals with the same job title as petitioner were not converted to full-time employment.

¶ 19    Barrow related that at the end of January 2020, Ingram converted five temporary workers in the receiving department to full-time employment. These workers were in different positions than petitioner, did not perform the same duties, and were compensated at a much lower rate of pay. The workers who were converted were Hispanic or Latino, Caucasian, African-American, and Asian individuals. Petitioner never applied or interviewed for any full-time position during his temporary assignment.

¶ 20    Blanco told the investigator that he trained petitioner for about one or two weeks in 2019. He stated that "at the conclusion of" petitioner's training, there were "occasional interactions" in the warehouse. He denied subjecting petitioner to harassment, differential treatment, or profanity. He stated that he treats everyone the same and petitioner's race was irrelevant. He strives to be professional and respectful during his interactions with everyone, but sometimes yells in the

warehouse due to the noise level. He provided honest assessments of petitioner's performance and does not provide recommendations on which employees are converted to full-time.

¶ 21    Marisol Rivera, a human resources employee of Ingram, told the investigator that she spoke with petitioner around August 2019. Petitioner and his brother expressed that everything had been "good" with his experience at Ingram so far, other than they had "a problem" with Blanco. Petitioner told Rivera "he was not happy with Blanco, but it was nothing serious." Petitioner did not provide additional details and did not mention that the problem had anything to do with his race. Rivera advised petitioner to make a formal claim to his SureStaff representative, Erica Garcia.

¶ 22    According to Rivera, petitioner expressed concern to his supervisor, Christine Coglianese, regarding Blanco's communication style, but did not attribute the issue to his race. Coglianese advised petitioner that she would observe Blanco and speak with him. Coglianese noted that Blanco did not use the word "please" when issuing instructions and used short statements, such as "move the pallets to this zone." Coglianese determined that Blanco's management style was not directed at any particular group of employees but reflected how he dealt with all employees under his supervision. Coglianese explained to Blanco that his communication style was professionally acceptable, but his tone could be perceived as disrespectful and short. She encouraged him to adjust his tone, and he agreed. Following Coglianese's conversation with Blanco, petitioner never expressed additional concerns.

¶ 23    In rebuttal, petitioner stated that he told Ingram on multiple occasions that he was being harassed. He disagreed with Ingram's assertion that he did not report or complain about being subjected to harassment and discrimination due to his race.

¶ 24    After reviewing the evidence, the investigator recommended a finding of lack of substantial evidence to support petitioner's charge of discrimination and retaliation.

¶ 25    Regarding Count A (racial harassment), the investigator concluded there was no evidence that Ingram subjected petitioner to harassment based on his race. The investigator explained that, even assuming the truth of petitioner's allegations that Blanco subjected him to harsh language and profanity, the conduct did not rise to the level of actionable harassment. Actionable harassment, the investigator noted, occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. The incidents as alleged by petitioner were work-related and were not sufficiently severe or pervasive to constitute a hostile work environment.

¶ 26    Further, the investigator noted that petitioner did not establish that Ingram was motivated by a discriminatory intent, or that he was subjected to a pattern of incidents that were pervasive. The investigator explained that petitioner acknowledged he did not hear derogatory comments or statements pertaining to his race, did not allege any punitive actions taken by Ingram, and did not allege any adverse actions affecting his salary, benefits, or responsibilities. The investigator concluded that petitioner offered no evidence that Ingram took actions that were adverse or discriminatory and that there was no evidence Ingram was motivated by a discriminatory reason.

¶ 27    Regarding Count B (racial discrimination), the investigator concluded there was no evidence that petitioner was not converted to full-time employment due to his race. The investigator noted that to present a discrimination case, petitioner was required to show that (1) he was a member of a protected class, (2) he was performing his work satisfactorily, (3) he was subject

to an adverse action, and (4) Ingram treated a similarly situated employee outside his protected class more favorably under similar circumstances. The investigator found that petitioner's claim of discrimination failed "at the third prong," as an adverse action must be sufficiently severe and pervasive to constitute a term and condition of employment, and petitioner had not alleged any adverse actions affecting his salary, benefits, or responsibilities.

¶ 28    The investigator noted that Ingram set forth several conditions that must be met before a temporary worker could be considered for conversion to full-time employment and maintained that such conversion is determined based on business necessity and is not guaranteed. Ingram also proffered evidence that over 100 temporary workers from at least four staffing agencies, several of whom maintained the same job title as petitioner, were not converted to full-time employment. The investigator concluded that petitioner had offered no evidence "beyond speculation" that Ingram's decision was motivated by his race or a discriminatory reason.

¶ 29    Regarding Count C (retaliation), the investigator concluded there was no evidence that petitioner was not converted to full-time employment in retaliation for complaining about discrimination. The investigator explained that to present a retaliation case, petitioner was required to show that (1) he engaged in a protected activity, (2) a materially adverse act was committed against him, and (3) a causal nexus existed between the protected activity and the adverse act. The investigator found that petitioner's claim of retaliation failed "at the second prong," as an adverse action must be sufficiently severe and pervasive so as to constitute a term and condition of employment, and petitioner had not alleged any adverse actions affecting his salary, benefits, or responsibilities.

¶ 30    The investigator noted that Ingram had set forth several conditions that must be met before a temporary worker could be considered for conversion to full-time employment, and that, according to Ingram, such conversion is determined based on business necessity and is not guaranteed. Ingram also proffered evidence that over 100 temporary workers from at least four staffing agencies, several of whom maintained the same job title as petitioner, were not converted to full-time employment. The investigator concluded that petitioner had offered no evidence "beyond speculation" that Ingram's decision was motivated by his alleged participation in a protected activity or by a discriminatory reason.

¶ 31    On December 28, 2020, the Department dismissed petitioner's charge of discrimination and retaliation. In its notice of dismissal, the Department stated that, based upon the investigation report, it determined there was not substantial evidence to support the allegations in the charge.

¶ 32    On March 29, 2021, petitioner filed a request for review with the Commission. In the request, he stated that "because of the corona virus" he had been unable to provide documents to support his case. He asserted that the investigator had no knowledge of the case and stated, "And I did not get a sit down interview. I was just given a telephone conference." The Department and Ingram both filed responses to petitioner's request for review.

¶ 33    On November 2, 2021, the Commission sustained the Department's dismissal of the charge for lack of substantial evidence.

¶ 34    With regard to Count A (racial harassment), the Commission explained that, even taking petitioner's factual allegations as true, the resulting environment did not reach the level of "hostile" or "abusive" to be legally actionable. The Commission noted that Blanco trained petitioner for one or two weeks and then only had occasional interactions with petitioner over the course of his six-

month stint at Ingram. It further noted that, although Blanco scrutinized, criticized and swore at petitioner, Blanco did not use any racial epithets, comment on petitioner's race, or physically threaten or humiliate him.

¶ 35    With regard to Count B (racial discrimination), the Commission explained that the evidence was insufficient to establish a *prima facie* case of discrimination because there was no evidence that petitioner applied for any open position or that Ingram sought or hired other applicants for the position of senior logistics associate who were of a different protected class. With regard to Count C (retaliation), the Commission explained that, assuming the evidence was sufficient to establish a *prima facie* case of retaliation, Ingram "assert[ed] that it did not hire anyone in Petitioner's position, and Petitioner presented no evidence to the contrary." The Commission found that petitioner had not proven "this" was pretextual.

¶ 36    Petitioner filed a timely petition for direct review in this court on December 2, 2021.

¶ 37                    II. ANALYSIS

¶ 38    In his *pro se* brief, petitioner contends that Blanco harassed him based on his race; that he engaged in protected activity when he complained to human resources on August 12, 2019; and that he was denied full-time employment in retaliation for reporting the harassment.

¶ 39    As an initial matter, we note that petitioner's brief is lacking in many respects. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires that an appellant's brief contain arguments supported by citations to the authorities and the pages of the record relied on. "A failure to cite relevant authority violates Rule 341 and can cause a party to forfeit consideration of the issue." *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23. Moreover, when an appellant fails to comply with Rule 341, this court may strike the brief and dismiss the appeal. *Holzrichter v. Yorath*,

2013 IL App (1st) 110287, ¶ 77. An appellant's *pro se* status does not relieve him of his obligation to comply with Rule 341. *Wing v. Chicago Transit Authority*, 2016 IL App (1st) 153517, ¶ 7.

¶ 40    Here, petitioner's brief consists primarily of a lengthy statement of facts and does not include any citations to authorities or the record. He has attached copies of documents that, because they were not presented to the Department or the Commission, we may not consider on appeal. *Persaud v. Illinois Department of Employment Security*, 2019 IL App (1st) 180964, ¶ 27. In these circumstances, we would be justified in striking petitioner's brief and dismissing the appeal. *Holzrichter*, 2013 IL App (1st) 110287, ¶ 77.

¶ 41    However, while the insufficiency of petitioner's brief hinders our review, meaningful review is not completely precluded, as, for the most part, the merits of the case can be ascertained from the record on appeal. This court may entertain the appeal of a party who files an insufficient brief "so long as we understand the issue [the party] intends to raise and especially where the court has the benefit of a cogent brief of the other party." *Twardowski v. Holiday Hospitality Franchising, Inc.*, 321 Ill. App. 3d 509, 511 (2001). In this case, the State respondents have filed a cogent brief, and it is clear that petitioner is challenging the dismissal of his charge of discrimination and retaliation. Accordingly, we choose to reach the merits of petitioner's appeal.

¶ 42    The Illinois Human Rights Act (Act) provides that it is a civil rights violation for an employer to, among other things, engage in harassment, refuse to hire, or act with respect to hiring "on the basis of unlawful discrimination." 775 ILCS 5/2-102(A) (West 2018). "Unlawful discrimination" includes "discrimination against a person because of his or her actual or perceived: race[.]" *Id.* § 1-103(Q). It is also a civil rights violation to retaliate against a person because he has

opposed what he "reasonably and in good faith believes to be unlawful discrimination *** in employment[.]" *Id.* § 6-101(A).

¶ 43    Under the Act, upon the filing of a discrimination charge, the Department must conduct a full investigation of the allegations and prepare a written report. *Id.* § 7A-102(C)(1), (D)(1). The Department must then review the report to determine whether there is "substantial evidence" that the alleged discrimination has occurred. *Id.* § 7A-102(D)(2). "Substantial evidence," as defined by the Act, is "evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance." *Id.*

¶ 44    If the Department determines that there is no substantial evidence to support the allegation, the charge is dismissed. *Id.* § 7A-102(D)(3). The petitioner may seek review by the Commission of the dismissal. *Id.* If the Commission sustains the dismissal, the petitioner may seek judicial review in the appellate court. *Id.* § 8-111(B)(1).

¶ 45    We review the decision of the Commission, not the Department. *Alcequeire v. Human Rights Commission*, 292 Ill. App. 3d 515, 519 (1997). The Commission's findings of fact are entitled to deference and "shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." 775 ILCS 5/8-111(B)(2) (West 2018). However, the Commission's ultimate decision to sustain the dismissal of a charge will be reversed only if the decision was arbitrary and capricious or an abuse of discretion. *Stone v. Department of Human Rights*, 299 Ill. App. 3d 306, 314 (1998). A decision is arbitrary and capricious if it contravenes legislative intent, fails to consider a critical aspect of the matter, or offers an explanation so implausible that it cannot be a result of the exercise of the agency's expertise. *Young v. Illinois*

*Human Rights Commission*, 2012 IL App (1st) 112204, ¶ 33. An abuse of discretion will be found where no reasonable person could agree with the Commission's decision. *Id.* Under this standard, we may not reweigh the evidence or substitute our judgment for that of the Commission. *Id.*

¶ 46    We note that judicial review of an administrative decision extends "to all questions of law and fact presented by the entire record before the court." 735 ILCS 5/3-110 (West 2020). As such, we may affirm on any basis in the record, even if the agency relied on another basis to support its decision. See *Boaden v. Department of Law Enforcement*, 267 Ill. App. 3d 645, 652 (1994) ("Because we review the order entered, not the reasoning underlying it, we may affirm the decision of an administrative agency when justified in law for any reason.").

¶ 47    Addressing the counts of petitioner's charge in turn, we first find that the Commission did not abuse its discretion in sustaining the dismissal of Count A (racial harassment). As noted above, the Act prohibits employers from subjecting employees to harassment on the basis of their race. 775 ILCS 5/1-103(Q), 2-102(A) (West 2018). When analyzing employment discrimination actions brought under the Act, Illinois courts have adopted the analytical framework set forth in federal courts' decisions. *Zaderaka v. Illinois Human Rights Commission*, 131 Ill. 2d 172, 178 (1989).

¶ 48    A *prima facie* case of harassment contains four elements: (1) the employee was subject to unwelcome harassment; (2) the harassment was based on a reason forbidden by anti-discrimination laws; (3) the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile or abusive working environment; and (4) there is a basis for employer liability. *Smith v. Illinois Department of Transportation*, 936 F. 3d 554, 560 (7th Cir. 2019); *Brummett v. Illinois Human Rights Commission*, 2021 IL App (4th) 200056-U, ¶¶ 34-35. In the employment context, harassment is "conduct that unreasonably interferes with a person's work

performance or creates an intimidating, hostile, or offensive work environment." *Ngeunjuntr v. Metropolitan Life Insurance Co.*, 146 F.3d 464, 467 (7th Cir. 1998). Such conduct must be "sufficiently severe or pervasive that a reasonable person would find it hostile and the victim himself subjectively sees as abusive." *Id.*

¶ 49    In determining whether an environment is "hostile" or "abusive," a court must look at all the circumstances, which may include the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). To constitute actionable harassment, an employee must face a "steady barrage" of offensive comments, and "[m]ore than a few isolated incidents of harassment." *Village of Bellwood Board of Fire & Police Commissioners v. Human Rights Commission*, 184 Ill. App. 3d 339, 350 (1989).

¶ 50    Here, the record does not reveal substantial evidence of harassment based on race so as to establish a *prima facie* case. Petitioner alleged that Blanco harassed him based on his race. However, when interviewed by the investigator, petitioner conceded that he never heard Blanco make derogatory comments or statements pertaining to his race. Instead, he related that there were several instances when Blanco used profanity when giving him direction or criticizing his work. The only comment petitioner identified that related to race at all was when Blanco asked him if he was Hispanic.

¶ 51    The Commission concluded that, even taking petitioner's factual allegations as true, the environment he described did not reach the level of "hostile" or "abusive" to be legally actionable. We agree that the evidence did not reveal severe or pervasive racial harassment that altered the

conditions of employment or created a hostile or abusive working environment for petitioner. In these circumstances, we cannot say that the Commission abused its discretion or acted arbitrarily and capriciously when it concluded there was no substantial evidence to support a charge of discrimination based on racial harassment. See *Spencer v. Illinois Human Rights Commission*, 2021 IL App (1st) 170026, ¶¶ 32, 35.

¶ 52    We next address whether the Commission abused its discretion in sustaining the dismissal of Count B (racial discrimination). When analyzing employment discrimination actions brought under the Act, Illinois courts have adopted the three-prong analytical framework set forth in federal courts' decisions. *Zaderaka*, 131 Ill. 2d at 178. First, the employee has the initial burden of proving a *prima facie* case of unlawful discrimination by a preponderance of the evidence. *Spencer*, 2021 IL App (1st) 170026, ¶ 33. To establish a *prima facie* case of employment discrimination, there must be evidence that (1) the employee is a member of one or more protected classes; (2) he was meeting his employer's reasonable work expectations; (3) he was subject to an adverse action; and (4) similarly situated individuals who were not in his protected class or classes were treated more favorably. *Id.* ¶ 34.

¶ 53    Second, if the employee establishes a *prima facie* case, "the employer must articulate, not prove, a legitimate, nondiscriminatory basis for its action." *C.R.M. v. Chief Legal Counsel of Illinois Department of Human Rights*, 372 Ill. App. 3d 730, 733 (2007). Third, if the employer articulates such a reason, then the burden shifts back to the petitioner to prove by a preponderance of the evidence that the employer's articulated reason was not true and was a pretext for unlawful discrimination. *Id.* A petitioner's failure "to present substantial evidence of a *prima facie*

discrimination claim or to disprove an employer's articulated reason for discharge warrants dismissal of the charge." *Owens v. Department of Human Rights*, 356 Ill. App. 3d 46, 52 (2005).

¶ 54 Here, petitioner alleged that at the end of his temporary assignment at Ingram, he was not hired for full-time employment due to his race. However, when petitioner was interviewed by the investigator, he conceded that he never applied for or interviewed for a full-time position. Further, Barrow, a senior human resources employee at Ingram, told the investigator that in January 2020, when petitioner's temporary assignment as a senior logistics associate in the receiving department ended, Ingram had a sufficient number of full-time senior logistics associates in the department and did not have a business need for additional employees in that position. She related that at that time, Ingram ended the assignments of over 100 temporary workers from about four staffing agencies, at least seven of whom had the same job title as petitioner. Although Ingram converted five temporary workers in the receiving department to full-time employment, those employees were in different positions than petitioner, did not perform the same duties, and were compensated at a much lower rate of pay.

¶ 55 The Commission concluded petitioner had not established a *prima facie* case of discrimination because there was no evidence he applied for any open position or that Ingram sought or hired other applicants for the position of senior logistics associate who were not of petitioner's protected class. We agree that petitioner failed to make a *prima facie* case of employment discrimination based on race. Where petitioner did not apply for any open position at Ingram, it cannot be said that he was subject to an adverse action when his temporary employment ended and he was not converted to full-time employment. Moreover, there is no evidence in the record to support a finding that any similarly situated temporary worker who was not a member of

petitioner's protected class received more favorable treatment in comparable circumstances. See *Young*, 2012 IL App (1st) 112204, ¶¶ 47-48.

¶ 56 Further, even if petitioner had established a *prima facie* case, Ingram articulated a legitimate, nondiscriminatory reason for not converting his employment from temporary to permanent: it had no need for additional full-time employees in petitioner's position. Petitioner has presented no evidence that Ingram's reason for not hiring him for full-time, permanent employment at the end of his temporary assignment was pretextual and unworthy of belief. See *All Purpose Nursing Service*, 205 Ill. App. 3d at 827. Accordingly, the Commission did not abuse its discretion or act arbitrarily and capriciously in affirming the dismissal of petitioner's charge of discrimination for lack of substantial evidence.

¶ 57 Finally, we address Count C (retaliation). To establish a *prima facie* case of retaliation under the Act, a petitioner must show that (1) he was engaged in a protected activity; (2) his employer committed a material adverse action against him; and (3) a causal nexus existed between the protected activity and the adverse act. *Hoffelt v. Illinois Department of Human Rights*, 367 Ill. App. 3d 628, 634 (2006). A *prima facie* case of retaliatory discharge can be established by showing a short time span between engaging in a protected activity and the employer's adverse action. *Id.* at 638.

¶ 58 If an employee establishes a *prima facie* case, a rebuttable presumption of unlawful retaliation arises. *Id.* To rebut the presumption, the employer must articulate a legitimate, nondiscriminatory reason for the action. *All Purpose Nursing Service v. Illinois Human Rights Comm'n*, 205 Ill. App. 3d 816, 827 (1990). If the employer articulates such a reason, the burden

then shifts back to the employee to prove, by a preponderance of the evidence, that the legitimate reasons offered by the employer were a pretext for discrimination. *Id.*

¶ 59 Here, petitioner alleged Ingram did not hire him for a permanent, full-time position in retaliation for complaining internally about discrimination. When he was interviewed by the investigator, he stated that he engaged in protected activity in August 2019, when he complained to a human resources representative that he was being harassed by Blanco due to his race. In contrast, Barrow stated that there was no record of petitioner reporting harassment or disparate treatment, engaging in any protected activity, or complaining of racial discrimination. In addition, the human resources employee with whom petitioner spoke in August 2019, Rivera, related to the investigator that petitioner told her "he was not happy with Blanco, but it was nothing serious." Petitioner did not provide Rivera with additional details and did not mention that his "problem" with Blanco had anything to do with race.

¶ 60 Even assuming petitioner engaged in a protected activity by complaining about Blanco, he has not satisfied the other two prongs of a *prima facie* case. As with petitioner's claim of racial discrimination, his claim of retaliation fails because he did not apply for a full-time position, and therefore, was not subject to an adverse action when his employment was terminated at the end of his temporary assignment. In turn, where there was no adverse action, it cannot be said that a causal nexus existed between such an action and petitioner's protected activity.

¶ 61 Moreover, had petitioner established a *prima facie* case, the Commission correctly found that Ingram articulated a legitimate, nondiscriminatory reason for its action. As noted above, Barrow told the investigator that in January 2020, when petitioner's temporary assignment as a senior logistics associate in the receiving department ended, Ingram had a sufficient number of

full-time senior logistics associates in the department and did not have a business need for additional employees in that position. Petitioner has presented no evidence that Ingram's reason for not hiring him for full-time, permanent employment at the end of his temporary assignment was pretextual and unworthy of belief. See *All Purpose Nursing Service*, 205 Ill. App. 3d at 827. As such, petitioner failed to establish that Ingram refused to hire him in retaliation for complaining about discrimination. Based on the record before us, we find the Commission did not abuse its discretion or act arbitrarily and capriciously in sustaining the dismissal of the charge of retaliation for lack of substantial evidence.

¶ 62                                III. CONCLUSION

¶ 63    For the reasons explained above, we affirm the decision of the Commission.

¶ 64    Affirmed.